MICHAEL L. TRACY, ESQ., SBN 237779
MTRACY@MICHAELTRACYLAW.COM
LAW OFFICE OF MICHAEL TRACY
2030 Main Street, Suite 1300
Irvine, CA  92614
T: (949) 260-9171
F: (866) 365-3051

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| HOLLI MENDEZ, *et al.* | Case No.:  2:10-cv-00072-MCE-DAD |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT CLASS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| TWEEN BRANDS, INC. | |
| Defendant. | Hearing Date: July 28, 2011 2:00 pm<br>Judge: Hon. Morrison C. England, Jr.<br>Depart: 7 |
| | Date Filed: January 8, 2010<br>Trial Date: NONE SET |

PLEASE TAKE NOTICE that on July 28, 2011 at 2:00 pm, or as soon thereafter as it may be heard, in Department 7 of this court located at 401 I St. Sacramento, CA, the parties will and hereby do move for an order for final approval of the class settlement.

DATED:  July 11, 2011                    LAW OFFICE OF MICHAEL TRACY

                                        By___/s/ Michael Tracy _____
                                          MICHAEL TRACY, Class Counsel

## Table of Contents

I.      INTRODUCTION ..........................................................................................1

II.     Factual and Procedural Background.......................................................1

        A.      Extent and Scope of Discovery ...................................................2

        B.      Mediation......................................................................................2

III.    Essential Settlement Terms.....................................................................3

IV.     Legal Argument ........................................................................................4

        A.      Strength of Plaintiffs' Case ........................................................4

                1.      Plaintiffs had a very good case for the
                bonus calculation theory but minimal damages. ..........................5

                2.      Plaintiffs had a reasonable case for the
                unpaid personal days but also limited damages. ..........................5

                3.      The off-the-clock claim had significant
                risks.      ...................................................................................6

                4.      The missed meal and rest break claims
                were potentially viable but had problem with
                damages because many employees were part-time
                and not entitled to meal breaks and the legal
                requirements for these breaks are not clear. .....................7

                5.      Plaintiffs' claims for waiting time
                penalties are problematic because they require a
                showing of "willfulness."........................................................9

                6.      The Private Attorney General Act
                claims are problematic because the State of
                California gets 75% of the money and the Court has
                discretion to limit their award.................................................9

        B.      The risk and complexity of this case favor
        settlement      ...................................................................................9

        C.      Maintaining class status on the meal break and
        off-the-clock cases through trial could be problematic.........................10

        D.      The amount offered in settlement is a fair
        approximation of the value of the case. ...................................................11

                1.      The use of the opt-in mechanism for the
                other claims is required by the Fair Labor Standards
                Act.        ...................................................................................11

**E.    Extensive discovery has been completed and preliminary issues litigated.** ..........................................................**12**

**F.    The experience and view of counsel weigh in favor of settlement.** ...............................................................**12**

**G.    The Labor and Workforce Development Agency specifically chose not to investigate these claims and is still receiving $37,500 from the settlement which is more than fair.** ..........................................................................**13**

**H.    The lack of objectors and the low number of opt-outs weighs in favor of settlements and the large number of undelivered mail items explains the average opt-in rate.** ............................................................................**13**

**I.    The settlement was reached through arm's-length bargaining** ..................................................................**15**

**J.    The enhancements to the named Plaintiffs are reasonable given the time they committed to this lawsuit and the risks they undertook in this litigation.** ............................**15**

**K.    The payment of 25% for attorney's fees is the standard approved by the Ninth Circuit.** ..................................**17**

**VI.    CONCLUSION** ........................................................................**17**

MOTION FOR FINAL APPROVAL

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adoma v. Univ. of Phoenix, Inc.*
   2011 U.S. Dist. LEXIS 29830 (E.D. Cal. Mar. 10, 2011) ......................................... 13

*Boyd v. Bechtel Corp.*
   485 F.Supp. 610 (C.D. Cal. 1979) ............................................................................. 14

*Brown v. Fed. Express Corp.*
   249 F.R.D. 580 (C.D. Cal. 2008) .............................................................................. 10

*Cook v. Niedert*
   142 F.3d 1004 (7th Cir. Ill. 1998) ............................................................................. 16

*Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*
   213 F.3d 454 (9th Cir. Nev. 2000) ............................................................................ 16

*Ellis v. Edward D. Jones & Co., L.P.*
   527 F. Supp. 2d 439 (W.D. Pa. 2007) ....................................................................... 14

*Gong-Chun v. Aetna, Inc.*
   No. Civ. 1:09-cv-01995, 2010 U.S. Dist. LEXIS 56938 (E.D. Cal. May 15, 2010) ... 10

*Hanlon v. Chrysler Corp.*
   150 F.3d 1011 (9th Cir. Cal. 1998) ........................................................................... 17

*Harris v. Vector Mktg. Corp.*
   2011 U.S. Dist. LEXIS 48878 (N.D. Cal. Apr. 29, 2011) ............................................ 4

*In re Anthracite Coal Antitrust Litigation*
   79 F.R.D. 707 (M.D. Pa. 1978) ................................................................................ 14

*Kempf v. Barrett Bus. Servs., Inc.*
   2007 U.S. Dist. LEXIS 86115 (N.D. Cal. July 31, 2007) ............................................. 9

*Kress v. PricewaterhouseCoopers, LLP*
   2009 U.S. Dist. LEXIS 117949 (E.D. Cal. Nov. 25, 2009) .......................................... 7

*Loretz v. Regal Stone, Ltd.*
   2010 U.S. Dist. LEXIS 130307 (N.D. Cal. Nov. 23, 2010) ........................................ 16

*Marshall v. Holiday Magic, Inc.*
   550 F.2d 1173 (9th Cir. 1977) .................................................................................. 14

*McElmurry v. U.S. Bank Nat'l Ass'n*
   495 F.3d 1136 (9th Cir. Or. 2007)................................................................6

*Murillo v. Pac. Gas & Elec. Co.*
   2010 U.S. Dist. LEXIS 73427 (E.D. Cal. July 20, 2010) ......................12, 16

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*
   221 F.R.D. 523 (C.D. Cal. 2004) ..............................................................14

*Rodriguez v. West Publ'g Corp.*
   563 F.3d 948 (9th Cir. Cal. 2009) ...............................................................4

*Thiebes v. Wal-Mart Stores, Inc.*
   2002 U.S. Dist. LEXIS 664 (D. Or. Jan. 9, 2002)......................................14

*Velasquez v. HSBC Fin. Corp.*
   2010 U.S. Dist. LEXIS 21311 (N.D. Cal. Feb. 18, 2010)............................7

*Wang v. Chinese Daily News, Inc.*
   236 F.R.D. 485 (C.D. Cal. 2006) ..............................................................14

*Wang v. Chinese Daily News, Inc.*
   623 F.3d 743 (9th Cir. Cal. 2010) .........................................................7, 11

*Williams v. MGM-Pathe Communs. Co.*
   129 F.3d 1026 (9th Cir. Cal. 1997) ...........................................................17

**CALIFORNIA CASES**

*Clark v. American Residential Services LLC*
   175 Cal. App. 4th 785 (2009).....................................................................16

*Consumer Advocacy Group, Inc. v. Kintetsu Enterprises of America*
   141 Cal. App. 4th 46 (2006)........................................................................4

*Dunk v. Ford Motor Co.*
   48 Cal. App. 4th 1794 (1996).......................................................................4

*Hernandez v. Vitamin Shoppe Industries Inc.*
   174 Cal. App. 4th 1441 (2009)...................................................................16

*Jaimez v. Daiohs USA, Inc.*
   181 Cal. App. 4th 1286 (2010).....................................................................8

**FEDERAL STATUTES**

29 U.S.C. § 216.............................................................................................6, 7

**CALIFORNIA STATUTES**

Cal. Lab. Code § 226(a) ................................................................................................. 6

Cal. Lab. Code § 226(f) ................................................................................................ 17

Cal. Lab. Code § 227.3 .................................................................................................. 5

Cal. Lab. Code § 2699 ................................................................................................... 9

Cal. Lab. Code § 2699(i) ............................................................................................... 9

Cal. Lab. Code § 2699(e)(2) .......................................................................................... 9

Cal. Lab. Code § 2699(l) .............................................................................................. 13

**OTHER STATUTES**

Business and Professions Code § 17200 ........................................................................ 2

Labor Code § 203 (4) ..................................................................................................... 2

Labor Code § 226 .......................................................................................................... 2

**OTHER AUTHORITIES**

29 C.F.R. § 778.209(a) .................................................................................................. 5

Fed. R. Civ. Proc. 23(e) ................................................................................................ 4

Rule 23 ...................................................................................................................... 6, 7

MOTION FOR FINAL APPROVAL

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Class Members seek final approval of the settlement class based on alleged wage and hour violations by TWEEN BRANDS, INC. ("TWEEN").  The parties reached a consensual settlement agreement after arm's length negotiation and conducting substantial discovery into the alleged Labor Code violations.  This Court granted preliminary approval of the settlement class and approved the proposed notice on March 29, 2011.

## II.   Factual and Procedural Background

TWEEN operates retail stores primarily located is shopping malls that sell apparel targeted to girls age 7-14.  The company previously used the name "Limited Too" and its stores currently use the name "Justice" as their public brand name. (Decl. Tracy ¶2).

TWEEN utilized hourly employees in its business to staff the retail stores with job titles such as "Assistant Sales Leader", "Lead Brand Rep", and "Store Sales Leader."  All of these employees were all paid on an hourly basis and some also received additional compensation in the form various bonuses and incentives.

TWEEN also had a companywide policy for the use of "personal days."  Personal days were essentially "floating holidays" given to the employees in addition to regular holidays, sick days, and regular vacation days. However, if employee had not used all the "personal days" at the end of his or her employment, then the days would be forfeit.

Also in contention are allegations that the employees worked "off-the-clock" and were not provided adequate meal and rest breaks.

Plaintiff MENDEZ filed this lawsuit on January 8, 2010.  Plaintiff HAWKES joined in the lawsuit and filed a First Amended Complaint on April 8, 2010.  The First Amended Complaint added HAWKES as a Plaintiff add the off-the-clock claims and included Fair Labor Standards Act collective action allegations.

The First Amended Complaint contains claims for (1) failing to pay the overtime under California law, (2)  failure to provide adequate paycheck stubs (Labor Code § 226), (3) waiting time penalties under Labor Code § 203, (4) overtime under the Fair Labor

1    Standards Act, (5) restitution under Business and Professions Code § 17200 for the above

2    mentioned Labor Code violations, (6) penalties for failing to provide MENDEZ copies of

3    her employment documents (this is in individual claim), and (7) civil penalties under the

4    Private Attorney General Act of 2004 ("PAGA") for overtime, (8) civil penalties for break

5    violations, (9) civil penalties for paystub violations, (10) civil penalties for failing to keep

6    accurate records, and (11) civil penalties for requiring employees to falsify time records.

7        On May 3, 2010, TWEEN filed a motion to strike paragraph 7 of the First Amended

8    Complaint that read "Private Attorney General Act causes of action do not require class

9    certification."

10       On July 1, 2010, this Court denied TWEEN's motion to strike noting that PAGA

11   claims did not require class certification.  (See Order Dated 7/1/2010, Document #22).

12       **A.    Extent and Scope of Discovery**

13       The parties conducted formal discovery.  Both Plaintiffs' depositions were taken and

14   Plaintiffs took the depositions of two company representatives.  In addition, one of

15   MENDEZ's coworkers/managers had her deposition taken.  Defendants propounded written

16   interrogatories and requests for productions of documents.  Plaintiffs propounded requests

17   for production of documents.

18       Plaintiffs, after agreeing to a protective order, received approximately four thousand

19   pages of documents.  The categories Plaintiff received were company policies, company

20   checklists, employee documents, training records, payroll records, computerized time

21   records that were signed by the employees, job descriptions, record retention policies,

22   bonus and incentive plan documents, scheduling documents, sales matrixes, and various

23   email correspondences.

24       **B.    Mediation**

25       Mediation took place on September 16, 2010 before Mark Rudy.  Mr. Rudy is an

26   experienced wage and hour mediator and has extensive experience with class actions.

27   (Decl. Tracy ¶3).

28

1  A basic settlement was reached at the mediation and a full settlement agreement was
2  drawn up and signed by the various individuals in January of 2011.

3  A motion for preliminary approval of the settlement class was filed on February 14,
4  2011 and preliminary approval was granted on March 29, 2011.

5  **III.   Essential Settlement Terms**

6  The maximum settlement amount is $1,900,000. From the amount, attorney's fees
7  (up to $475,000), costs (up to $15,000, $11,432 requested), incentive awards (up to $5,000
8  for each Plaintiff), payments to the LWDA (up to $37,500)[1], payments to the claims
9  administrator (estimated to be $45,000, actually $44,000), and payments for Personal Days
10 Claims, Bonus Overtime Claims, and Contest Overtime Claims (estimated at $105,000) are
11 deducted to arrive at a "Net Settlement Amount." (Settlement Agreement[2] p.6:24-7:8).

12 The Net Settlement Amount is then paid out to all class members who submit claims
13 based on a pro rata share determined by the total number of hours.  That is the total "Net
14 Settlement Amount" is divided by the total number of hours worked by all class members
15 to arrive at a payment per hours worked during the class period. Each employee who
16 submits a claim will then be paid the per hour damage amount multiplied by the number of
17 hours worked by that employee. (Settlement Agreement p.8:1-10).

18 If the total amount to be paid to  Class Members (including employer taxes) is less
19 than 50% of the Net Settlement Amount (which it is), each Class Member who submitted a
20 claim receives an increased pro-rata share up to double his or her original amount.  Any
21 remaining balance below the 50% amount will be paid to the Legal Aid Society –
22 Employment Law Center of San Francisco. (Settlement Agreement p.8:11-19). Currently,
23 the estimates for distributions indicate that although the minimum 50% guarantee will be

---

24

25 [1] The Settlement Agreement lists this as $50,000, however, because only 75% of the money is paid to the State of California, 25% is credited back to the class.  This "credit back" is described on page
26 7, line 18 of the Settlement Agreement, and only the net amount deducted is listed here for simplicity.

27 [2] The Settlement Agreement was filed with the motion for preliminary approval as Document #28.

28

1   triggered, all the payments will go to Class Members and none will be paid to the Legal Aid
2   Society. (Decl. Tracy ¶23).

3   **IV.    Legal Argument**

4          This Court has already determined that class treatment of the issues was warranted in
5   its Order granting preliminary approval of the class dated March 29, 2011.  The final
6   settlement of the class requires approval of this Court after a hearing to determine the
7   fairness of the settlement.  Fed. R. Civ. Proc. 23(e). The purpose of the court's review is to
8   "prevent fraud, collusion or unfairness to the class."  *Consumer Advocacy Group, Inc. v.*
9   *Kintetsu Enterprises of America*, 141 Cal. App. 4th 46, 60 (2006) quoting *Dunk v. Ford*
10  *Motor Co.*, 48 Cal. App. 4th 1794, 1800 (1996).  The court must be satisfied that the
11  settlement is "fair, adequate, and reasonable." *Dunk* at 1801.

12         In determining the adequacy of the settlement, several factors are typically analyzed
13  including (1) the strength of plaintiffs' case, (2) the risk, expense, complexity and likely
14  duration of further litigation, (3) the risk of maintaining class action status through trial, (4)
15  the amount offered in settlement, (5) the extent of discovery completed and the stage of the
16  proceedings, (6) the experience and views of counsel, (7) the presence of a governmental
17  participant, and (8) the reaction of the class members to the proposed settlement.  *Rodriguez*
18  *v. West Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. Cal. 2009).  Ultimately, in determining
19  whether the "settlement is fair, reasonable, and adequate, the court must examine whether
20  the interests of the class are better served by the settlement than by further  litigation."
21  *Manual for Complex Litigation, Fourth* (Fed. Judicial Center 2004) *("Manual")* § 21.61.

22         **A.    Strength of Plaintiffs' Case**

23         In evaluating the strength of the Plaintiffs' case in the context of settlement, courts
24  will look at a classes "expected recovery" compared to the settlement amount.  *Harris v.*
25  *Vector Mktg. Corp.*, 2011 U.S. Dist. LEXIS 48878, *29 (N.D. Cal. Apr. 29, 2011).  Here,
26  there are six groups of claims: (1) those who received bonuses, (2) those who had unused
27  "personal days", (3) potential claims for off-the-clock work, (4) potential claims for missed
28  meal and rest breaks, (5) waiting time penalties, and (6) various civil penalties under the

Private Attorney General Act.  Each of these has slightly different analyses in terms of their strengths and weaknesses.

### 1. **Plaintiffs had a very good case for the bonus calculation theory but minimal damages.**

The issue with the bonuses is that Plaintiffs claim that the overtime on those bonuses was not computed properly.   Class Counsel evaluated the payroll records and determined that TWEEN was dividing the bonus by the total number of hours paid rather than the total number of hours worked.  When an employee received sick or vacation days, the number of hours paid for exceeded the number of hours worked causing the amount of overtime to be less.  Plaintiffs contend that this is in violation of the regulations that require overtime to be computed on bonuses by dividing by "total hours worked."  29 C.F.R. § 778.209(a).

There were also issues with whether certain prizes and periodic contest involving the store's sales of customer gift cards needed to be in included in the regular rate of pay.

Although Plaintiffs felt that they had a strong case, the amount of actual damages under this theory is very small.  Plaintiff Hawkes had less than $1.00 in damages and Plaintiff Mendez had none. (Decl. Tracy ¶4). As such, TWEEN claims that because this results in a *de minimis* calculation, no money is due.

### 2. **Plaintiffs had a reasonable case for the unpaid personal days but also limited damages.**

Plaintiffs also had an issue with unpaid "personal days."  TWEEN provides a variety of paid time off to employees, including holidays, sick days, and vacation time.  In addition to all of these, TWEEN also offered something called "personal days."  (Decl. Tracy ¶5). Plaintiffs contended that these "personal days" were essentially a "vacation plan" simply called a different name. Under California law, vested "vacation" must be paid to the employee upon termination.  Cal. Lab. Code § 227.3.  Although Plaintiffs had a good claim for these unpaid personal days, because the policy that they would be lost was well known to the employees, most of them used the personal days and the total estimate of damages for this claim was around $100,000. (Decl. Tracy ¶6). Defendant argues that no money is due

1  because the policy is separate from the "vacation" policy and all vacation days are paid out

2  in accordance with the law.

3                  3.    **The off-the-clock claim had significant risks.**

4        Plaintiffs' off-the-clock allegations had several hurdles to overcome.  The main issue

5  was that all the Class Members had signed weekly timesheets.  Each of the timesheets had a

6  statement whereby the employee confirmed the "accuracy of the total hours and punches of

7  the meal periods" that were on the timecard.  (See Decl. Tracy, Exhibit E in support of

8  motion for preliminary approval, Document 28-2 Filed 02/14/11 Page 75 of 75).  In

9  addition, as the attached exhibit shows, the employees were able to and did correct these

10 punches.  Plaintiffs planned on using company documents that showed what a typical store

11 schedule should look like to show that more hours were likely worked than were recorded.

12 However, the experience of Class Counsel is that this method of proof would be

13 problematic.  (Decl. Tracy ¶7).  For similar reasons, Plaintiff's claims for improper pay

14 stubs have the same problems. That is Plaintiffs allege that the paycheck stubs are

15 inaccurate because they do not show the true number of hours worked due to the off-the-

16 clock work. Cal. Lab. Code § 226(a).

17                  a.    Plaintiffs primarily rely on the Fair Labor Standards Act for the

18                        off-the-clock overtime claims

19       Although Plaintiffs admit there are significant risks, especially with maintaining

20 class certification of the off-the-clock claims, Plaintiffs primarily rely on the Fair Labor

21 Standards Act's collective action certification requirements to help remedy this problem.

22 That is, "A 'collective action' differs from a class action." *McElmurry v. U.S. Bank Nat'l*

23 *Ass'n*, 495 F.3d 1136, 1139 (9th Cir. Or. 2007). Unlike a Rule 23 class action, a collective

24 action brought under 29 U.S.C. § 216 requires that each plaintiff "opt in" to the lawsuit by

25 giving consent in writing. *Id*. Given that non-parties are not bound by the results of a

26 collective action, the certification process is not designed to ensure due process is being

27 provided to unnamed parties, and is instead about the district court managing the action in

28 an orderly fashion. *Id.*

In managing a collective action, the typical procedure in the Ninth Circuit is to follow a "two-tier" approach. *Kress v. PricewaterhouseCoopers, LLP*, 2009 U.S. Dist. LEXIS 117949, 9 (E.D. Cal. Nov. 25, 2009). See Also, *Velasquez v. HSBC Fin. Corp.*, 2010 U.S. Dist. LEXIS 21311 (N.D. Cal. Feb. 18, 2010). Under this approach, the first tier is used to send notice to "similarly situated" individuals. Id. In determining whether individuals are "similarly situated" for purposes of a collective action, the Court "requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" *Id.* quoting *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. Kan. 2001). The standard is "fairly lenient," and typically results in certification. *Id*.

The Ninth Circuit has held that a Rule 23 class action can proceed jointly with a Fair Labor Standards Act  collective action. *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 761 (9th Cir. Cal. 2010)

> **4.      The missed meal and rest break claims were potentially viable but had problem with damages because many employees were part-time and not entitled to meal breaks and the legal requirements for these breaks are not clear.**

Plaintiffs asserted that they were not able to take meal and rest breaks.  For these claims, Plaintiffs had several problems:  (1) the Class Members had all signed the weekly timesheets indicating that they did take the required breaks, (2) TWEEN had a stated policy of paying the employees the required one hour of pay automatically if the employee did not record the break in the electronic time tracking system, (3) TWEEN contended that the breaks were always "provided" to the employees, even though some of them chose not to take the breaks.  (Decl. Tracy ¶8).  On this last issue, the law is not currently clear as to whether an employer must simply make breaks available to the employees or actually ensure that they are taken.  For a general discussion of the issue, see *Jaimez v. Daiohs USA, Inc.*, 181 Cal. App. 4th 1286, 1303 (2010).

Plaintiffs countered that many of the stores only had one employee scheduled at a time such that it was impossible to take a break. However, a review of statistical information regarding the shifts worked by Class Members shows that many of the employees did not work enough hours to require a meal break. California law does not require a meal break for work periods of 6 hours or less[3].  Cal. Code of Regs., Title 8, Section 11070(11). Many of the employees were part-time employees.  For instance, of the "Lead Brand Reps", 50.7% of their total shifts worked were 6 hours or less.  For the "Sales" positions, which made up 51.5% of the shifts for the class, 91.9% of the shifts were six hours of less.

Using the above, assuming the 2,500 employees missed a meal in each and every shift worked more than 6 hours, this would amount to $4,708.064 in damages in a 4 year period.  (Assuming 2500 employees working 5 days a week, using the above percentages, and making $12/hr).  This number should not be seen as a realistic outcome because it ignores the fact that many of the employees were already paid for a missed meal by the automatic payment or that the employee actually clocked out and took a break.  Given these other discounting factors, the realistic "best case" scenario at trial would likely be approximately ½ of the above number or $2.5 million for missed meal breaks.

The claim for missed rest breaks was problematic because, unlike meal breaks, the law is clear that rest breaks need only be made available to the employee, there is no requirement that the employee actually take them.  (Cal. Code of Reg., Title 8, Section 11070(12).  The employees had signed the timecards indicating that they had either taken or waived the required rest breaks.  (See Memorandum of Point and Authorities in support of the motion for preliminary approval, Document #28-1, Pages 3-5 for discussion of evidence on these claims.)

---

[3] No meal break is required at all for periods of 5 hours or less and there is no dispute that  meal breaks can be waived from periods of 6 hours or less.  The legal issue pending before the California Supreme Court is whether the employer must require employees to take a meal on shifts longer than 6 hours or whether these breaks can be waived as well.

5.    **Plaintiffs' claims for waiting time penalties are problematic because they require a showing of "willfulness."**

In order for Plaintiffs to receive waiting time penalties, they must prove that the violation was "willful." *Kempf v. Barrett Bus. Servs., Inc.*, 2007 U.S. Dist. LEXIS 86115, *23-24 (N.D. Cal. July 31, 2007). A "good faith dispute that any wages are due will preclude the imposition of waiting time penalties under Section 203." Cal. Code of Regs. Title 8, Section 13520. As outlined above, even if Plaintiffs were to prove violations of the Labor Code, the imposition of the waiting time penalties is not certain as Defendant has some type of defense to each of the above claims.

6.    **The Private Attorney General Act claims are problematic because the State of California gets 75% of the money and the Court has discretion to limit their award.**

The claims under the Private Attorney General Act first require a showing that there was a violation of the Labor Code. Cal. Lab. Code § 2699. As outlined above, this is not a certainty. In addition, even if penalties were accessed, the State of California gets 75% of the money. Cal. Lab. Code § 2699(i). This Court could also lower the amount of any penalties assessed which makes estimating an actual award extremely difficult. Cal. Lab. Code § 2699(e)(2).

**B.    The risk and complexity of this case favor settlement**

As noted above, Plaintiffs' theory of the case requires them to prove that the time records that the employees signed as being accurate each week were, in fact, not accurate. The main challenge is that Plaintiffs would have had to interview large numbers of Class Members to try to identify patterns in when the time records were not accurate. Plaintiffs had a rather complex theory of using hypothetical optimum schedules to show that employees were working longer than they clocked into the system, but this would require substantial expert analysis with the risk that the jury simply not believe any of it.

1    Procedurally, the off-the-clock claims could also be very complex if they were

2    decertified as a class action but allowed to proceed under the more lenient "collective

3    action" standard of the Fair Labor Standards Act.

4    In addition, if Plaintiffs did win on the meal break claim based on a finding that

5    Defendants were required to ensure that breaks were taken, TWEEN would likely have

6    appealed any such decisions pending the California Supreme Court determining the legal

7    issue.  Alternately, TWEEN could have requested this Court to stay the meal break claims

8    pending resolution of the issue as several other courts have done. See, e.g., *Gong-Chun v.*

9    *Aetna, Inc.*, No. Civ. 1:09-cv-01995, 2010 U.S. Dist. LEXIS 56938 *15-16 (E.D. Cal. May

10   15, 2010).  As there is no certainty in when the California Supreme Court will rule and even

11   less certainty as to how the Court will rule, it is simply better to settle the issue so that Class

12   Members can get paid.

13   **C.    Maintaining class status on the meal break and off-the-clock cases**

14   **through trial could be problematic.**

15   As noted above, should the California Supreme Court hold that an employer need

16   only make meal breaks available to employees but not ensure that they take them, such a

17   ruling would make maintaining class status of the meal break claims problematic.  TWEEN

18   would no doubt argue that an individualized analysis as to why each employee missed each

19   meal break would be necessary.  Such an argument has persuaded many courts to deny

20   class certification of meal break claims. See, e.g. *Brown v. Fed. Express Corp.*, 249 F.R.D.

21   580, 587 (C.D. Cal. 2008).  Similar issues with individualized analysis are also present in

22   the off-the-clock claims in that TWEEN would argue that each alleged instance of off-the-

23   clock work needs to be analyzed individually.

24   Plaintiffs are confident that class status could be maintained on the technical

25   violations of the bonus computations and the unpaid personal days.

26

27

28

**D.      The amount offered in settlement is a fair approximation of the value of the case.**

As noted above, there are significant risks in this case. A "best case" result for off-the-clock work of 1 hour per week would be approximately $6,240,000. (2,500 employees working 1 hour off-the-clock each week for 4 years).  The "best case" estimate for meal and rest breaks claims is $2,500,000.  However, neither of these reflects a discounted risk of litigation.  The off-the-clock claim might have a 10% chance of maintain class certification and succeeding at trial.  The meal and rest break claim might have a 50% chance.  This gives an "expected value" of these claims of $1,874,000.

If Plaintiffs also assigned a 90% chance to winning on the bonus claims and unpaid personal day claims, this at 90% of $105,000 to the total to $1,968,500, which is very close to the $1,900,000 total for this settlement.

Although Plaintiffs do have claims for waiting time penalties, these should not significantly affect the value of the case because not only do they need to be discounted by the chance of winning the underlying claim, they must be further discounted by the high standard of proving willfulness. In the view of Class Counsel, these waiting time penalties do not significantly figure into cases such as this one.  (Decl. Tracy ¶9).

It should also be noted that TWEEN is paying 100% of the bonus claims and unpaid personal day claims regardless of whether the employee opts-in to this lawsuit.  As such, the settlement could not be more favorable to the employees for these claims.

1.      **The use of the opt-in mechanism for the other claims is required by the Fair Labor Standards Act.**

As noted above, the FLSA component is a significant factor in this case. That is, the lower standard required for FLSA certification is a key factor is driving settlement. However, the FLSA requires that employees affirmatively "opt-in" to the action in order to be bound by the result. *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 761 (9th Cir. Cal. 2010).  As such, individuals who do not opt-in to this class action can later file their own claims against TWEEN based on the FLSA, subject to TWEEN's argument that Class

1  Members cannot recover twice under state and federal law for the same overtime hours

2  worked.

3      **E.**    **Extensive discovery has been completed and preliminary issues litigated.**

4      Plaintiffs conducted extensive formal discovery in this case to prepare for a

5  contested motion for class certification. Thousands of documents were produce by TWEEN

6  which gave Class Counsel a detailed look into all the various pay provisions of TWEEN.  It

7  was in looking into these documents that Class Counsel identified the more technical

8  violations such as the regular rate of pay issues and the issues with the personal days. (Decl.

9  Tracy ¶10).  In addition, TWEEN informally produced a variety of statistical reports on the

10  shifts and hours worked by the putative class members.  The basic analysis of these reports

11  was that few employees worked more than 40 hours in a week and many shifts were for less

12  than 6 hours.  (Decl. Tracy ¶11).

13      **F.**    **The experience and view of counsel weigh in favor of settlement.**

14      "When approving class action settlements, the court must give considerable weight

15  to class counsel's opinions due to counsel's familiarity with the litigation and its previous

16  experience with class action lawsuits." *Murillo v. Pac. Gas & Elec. Co.*, 2010 U.S. Dist.

17  LEXIS 73427,*22 (E.D. Cal. July 20, 2010).  Here, Class Counsel has litigated hundreds of

18  wage and hour lawsuits and many class actions. (Decl. Tracy ¶12).  Class Counsel is also

19  experienced with payroll systems and computing the regular rate of pay which greatly

20  assisted with analyzing the large amount of data presented in this case. (Decl. Tracy ¶13).

21      Here, Class Counsel has handled several class actions which deal explicitly with the

22  issues of which additional payments need to be included in the regular rate of pay.

23  Specifically, the above mentioned cased of *Murillo v. Pac. Gas & Elec. Co.* is one in which

24  hourly employees did not have cash payments made to them in lieu of health benefits.  That

25  case involved complex issues of computing the regular rate of pay as well as which

26  payments could be excluded from the overtime computation.

27      In addition, Class Counsel is the attorney on *Adoma v. Univ. of Phoenix, Inc.*, 2011

28  U.S. Dist. LEXIS 29830 (E.D. Cal. Mar. 10, 2011).  One of the issues in that case is

1  whether tuition benefits provided to the employees need to be included in the regular rate of

2  pay on which overtime is computed.  This was very similar to the issues relating to the

3  inclusion of the various types of bonuses in the regular rate of pay.  *Adoma* also involves

4  off-the-clock claims in a computerized time tracking environment.  Although the systems

5  are very different, similar legal issues regarding commonality and typicality of claims

6  exists.

7         Based on the extensive experience of Class Counsel in litigation overtime issues

8  regarding the regular rate of pay and other technical issues with the pay due to hourly

9  employees, it is the view of Class Counsel that this settlement represents a fair result for the

10  class. (Decl. Tracy ¶14).

11         **G.    The Labor and Workforce Development Agency specifically chose not to**

12  **investigate these claims and is still receiving $37,500 from the settlement**

13  **which is more than fair.**

14         Plaintiffs, through their counsel, notified the Labor and Workforce Development

15  Agency (LWDA) of the alleged Labor Code violations.  The LWDA informed Plaintiffs

16  that it did not intend to investigate the allegations.  In addition, the LWDA did not intervene

17  in the action or otherwise cite TWEEN for any alleged violations. (Decl. Tracy ¶15).

18         Given that the LWDA was not involved in the matter, it has no authority to object to

19  the settlement and the California Legislature simply required that a court "shall review and

20  approve any penalties sought as part of a proposed settlement agreement."  Cal. Lab. Code

21  § 2699(l).  Here, the allocation of $50,000 to Private Attorney General Act penalties is

22  typically in line with other settlements that Class Counsel has been involved with. (Decl.

23  Tracy ¶16).

24         **H.    The lack of objectors and the low number of opt-outs weighs in favor of**

25  **settlements, and 24% of the funds available to the "opt-in" plaintiffs are**

26  **being claimed.**

27         A total of 9,209 class notices where sent out.  (Decl. Springer, Document #31, ¶8).

28  A total of 1,035 valid claims were submitted. (Dec. Springer ¶10).  No objections and only

1   three opt-outs were received.  (Decl. Springer ¶12-13).  This opt-out percentage weighs

2   further in favor of final approval.  See *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173,

3   1178 (9th Cir. 1977) (fact that the "overwhelming majority" of the class did not opt out

4   "presents at least some objective positive commentary as to its fairness"); *Wang v. Chinese*

5   *Daily News, Inc.*, 236 F.R.D. 485, 488 (C.D. Cal. 2006) (1% opt-out rate is typical in

6   employment actions).

7         As of the date of this motion, neither of the parties have been served with any Notice

8   of Objection (either timely or untimely filed).  Nor were any objections provided to the

9   Claims Administrator.  (Decl. Springer ¶13)  This absence of any objection weighs heavily

10  in favor of final approval.  *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 624 (C.D. Cal. 1979)

11  ("the Court finds persuasive the fact that eighty-four percent of the class has filed no

12  opposition"); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,  221 F.R.D. 523, 529 (C.D.

13  Cal. 2004) ("It is established that the absence of a large number of objections to a proposed

14  class action settlement raises a strong presumption that the terms of a proposed class

15  settlement action are favorable to the class members").  ( "extremely unusual not to

16  encounter objections to proposed settlements"  *In re Anthracite Coal Antitrust Litigation*,

17  79 F.R.D. 707, 712-713 (M.D. Pa. 1978)).

18        Although only 1,035 individuals "opted-in" to the class, such a rate (11.24%) is only

19  slightly below average.  See *Ellis v. Edward D. Jones & Co., L.P.*, 527 F. Supp. 2d 439,

20  444 (W.D. Pa. 2007) for opt-ins "between 15 and 30 percent" as typical. But see also,

21  *Thiebes v. Wal-Mart Stores, Inc.*, 2002 U.S. Dist. LEXIS 664, *8 (D. Or. Jan. 9, 2002) for a

22  2.7% opt-in rate.

23        In addition, although 11.24% of the individuals submitted claims, these claims

24  account for approximately 24% of the total amount available. (Decl. Tracy ¶23).  As such,

25  it is clear that individuals who had higher dollar claims were the ones who submitted the

26  claim forms.  Because of the 50% floor that was negotiated as part of the settlement, this

27  total amount will be adjusted upward so that the Class Members receive 50% of the funds

28

1   available for payout.  Due to the high level of dollar claims made, the Legal Aid Society

2   will not receive payment and all the funds will go to Class Members. (Decl. Tracy ¶23).

3           **I.      The settlement was reached through arm's-length bargaining**

4           The parties were actively litigating this case.  As will be outlined below, the parties

5   were conducting discovery with the intention of filing a contested motion for class

6   certification.  However, based on the issues relating to the Private Attorney General Act,

7   the parties felt that it would be more judicially efficient to discuss settlement prior to a

8   motion for certification.  It should be noted that this Court had ordered that a certification

9   motion be filed for a hearing date of January 27, 2011.  As the mediation was in September

10  of 2010 Plaintiffs would have had ample time to prepare and litigate a contested motion for

11  certification if that was necessary.  (Decl. Tracy ¶18).

12          At the mediation the parties agreed to settle the case on a class wide basis.  The Law

13  Offices of Michael Tracy and the law firm of Littler Mendelson practice regularly in the

14  context of employment law.  The firms have had several cases in which they have been

15  opposing counsel.  The relationship has always been professionally adversarial, and at no

16  time during any of the settlement negotiations did the parties collude to subvert the interests

17  of the Class. (Decl. Tracy ¶19).  All terms of the settlement are contained in the settlement

18  agreement and have been disclosed in the filings with this Court.  There are no "side

19  agreements" or any other terms between the parties or their attorneys that have not been

20  disclosed to this Court. (Decl. Tracy ¶20).

21          **J.      The enhancements to the named Plaintiffs are reasonable given the time**

22                  **they committed to this lawsuit and the risks they undertook in this**

23                  **litigation.**

24          In general, courts will approve additional payments to the named plaintiffs of a class

25  action to compensate them for the time and risk they undertook for participating in the

26  lawsuit.  *Cellphone Termination Fee Cases*, 186 Cal. App. 4th 1380, 1394 (2010).  In

27  particular, a court should look at (1) the financial risk to the named plaintiffs, (2) the

28  notoriety and personal difficulties encountered, (3) the amount of time and effort spent, (4)

1 | the duration of the litigation, and (5) the personal benefit enjoyed by the named plaintiffs.

2 | *Id.* See also *Clark v. American Residential Services LLC*, 175 Cal. App. 4th 785, 804

3 | (2009) and *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. Ill. 1998) for similar factors.

4 |     Here, Plaintiffs Mendez and Hawkes seek $5,000 enhancements. Such enhancements

5 | are generally in line with others awarded.  See *Loretz v. Regal Stone, Ltd.*, 2010 U.S. Dist.

6 | LEXIS 130307 (N.D. Cal. Nov. 23, 2010) approving $7,500 per named plaintiff. See also

7 | *Murillo v. Pac. Gas & Elec. Co.*, 2010 U.S. Dist. LEXIS 73427, *33 (E.D. Cal. July 20,

8 | 2010) approving a $10,000 enhancement for a single plaintiff in a wage and hour case.  *See*

9 | *Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454, 457 (9th Cir. Nev.

10 | 2000) approving $5,000 incentive award to each Plaintiff in a $1.725 million settlement.

11 |     The named Plaintiffs would have also been responsible for Defendant's costs should

12 | they not have prevailed in this lawsuit while unnamed class members would not have been.

13 | *Hernandez v. Vitamin Shoppe Industries Inc.*, 174 Cal. App. 4th 1441, 1460 (2009).  As

14 | such, Plaintiffs were the ones who actually put themselves at risk.  For a class action of this

15 | complexity, the litigation costs could easily have exceeded $50,000 had the case run its full

16 | course.  (Decl. Tracy ¶21).

17 |     In addition, Plaintiffs both had their depositions taken and spent several hours

18 | reviewing issues with Class Counsel.  (Decl. Tracy ¶22).  In contrast, Class Members had

19 | only fill out a claim form and drop it in the mail in order to receive payment.

20 |     It should also be noted that Ms. Mendez had pled an additional claim for failure to

21 | provide her a copy of her employment documents. (See First Amended Complaint,

22 | Document #12, Filed 04/08/2010, Sixth Cause of Action).  This claim has a $750 penalty

23 | associated with it.  Cal. Lab. Code § 226(f). As Ms. Mendez is resolving the claim as well,

24 | it provides further support for her enhancement award.

25 |     Given the risks undertaken by Ms. Hawkes and Ms. Mendez, the amounts and

26 | benefits received by other unnamed class members, the additional claim that Ms. Mendez is

27 | resolving, and the amount of time they have spent assisting with the litigation of this case,

28 | the enhancement payments as fair and reasonable.

**K.     The payment of 25% for attorney's fees is the standard approved by the Ninth Circuit.**

Plaintiffs concurrently submit their motion for attorney's fees.  The full justification and reasonableness of the request is fully briefed in that motion.  However, the Ninth Circuit "has established 25% of the common fund as a benchmark award for attorney fees." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. Cal. 1998).  This amount is computed based on the percentage of the entire fund, rather than on the percentage of claims actually made against the fund. *Williams v. MGM-Pathe Communs. Co.*, 129 F.3d 1026, 1027 (9th Cir. Cal. 1997). Given that the attorney's fees requested in this settlement are 25%, this amount is reasonable, as is more fully argued in the motion for attorney's fees.

## VI.     CONCLUSION

The parties came to a mutual settlement agreement to avoid the cost, expense, and risk of litigation.  This Court previously granted class certification of the settlement class based on a showing of commonality, typicality, numerosity, and adequacy of representation.  After mailing the approved class notice, the class had a 0.03% opt-out rate, and a 0% objection rate.  Based on the complexity of the case, the risk of continued litigation, the amount of the settlement, the normal participation rate, and the complete lack of any objectors, the Class Members respectfully request that final approval of this settlement class be granted

DATED: July 14, 2011                    LAW OFFICE OF MICHAEL TRACY

                                        By___/s/ Michael Tracy_____
                                          MICHAEL TRACY, Class Counsel